IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RAUL DELGADO | : CIVIL ACTION |
| | : |
| | : NO. 16-1765 |
| vs. | : |
| | : |
| UNITED STATES OF AMERICA | : |
| | : |

MEMORANDUM
WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

**KEARNEY, J.**                                                                 **March 16, 2017**

A United States Army veteran challenging the Veteran Affairs' surgery decisions resulting in removing his rectal and later liver cancer over a staged protocol and thus allowing him to live for over five years cancer free must show the surgeon's specific breach of a standard of care in this surgical protocol caused him injury. We find the veteran did not adduce evidence of his surgeons breaching a defined standard of care. After evaluating the credibility of testimony adduced from the veteran, his multiple treating physicians and competent experts, we find in favor of the Defendant and enter judgment in its favor in the accompanying Order.

I. **Findings of fact following trial.**

1. Raul Delgado entered the United States Army in or around August 1966, served as a supply sergeant in Vietnam, and the Army honorably discharged him in or around August 1968.

2. Mr. Delgado used the Veterans Affairs Medical Center ("VA") in Philadelphia as his main health care provider.

3. In November 2007, Mr. Delgado had a colonoscopy at the VA which showed a polyp in his rectum.

4. The VA doctors scheduled Mr. Delgado for an appointment at the Hospital of the University of Pennsylvania ("HUP") for a lower endosopic ultrasound. The ultrasound would help doctors determine if the polyp had invasive malignancy.

5. Mr. Delgado did not attend his scheduled HUP appointments and did not have a lower endosopic ultrasound.

6. In March 2010, Mr. Delgado suffered a heart attack and doctors at Hahnemann University Hospital performed heart surgery.

7. Mr. Delgado developed bowel problems during his stay at Hahnemann problems. Doctors performed a colonoscopy and saw a huge rectal mass and one small polyp. The doctors removed the polyp and contacted the VA to alert them Mr. Delgado required follow-up care.

8. On December 9, 2010, Mr. Delgado underwent a colonoscopy at the VA.

9. Dr. John Lieb, the VA's attending gastroenterologist, evaluated Mr. Delgado during the colonoscopy and testified credibly he believed Mr. Delgado's mass to be a large adenoma rather than cancer.

10. On December 10, 2010, Dr. Lieb met with Mr. Delgado and described two courses of treatment for the large adenoma: remove the mass by surgery, where a colorectal surgeon would remove part of the colon and/or rectum; or remove a large portion of the mass through a non-surgery endoscopic mucosal resection ("EMR").

11. Dr. Lieb credibly testified he had an "extensive discussion" to explain the risks and benefits of both options to Mr. Delgado.

12. Mr. Delgado elected to pursue EMR with Dr. Lieb and declined Dr. Lieb's offer to consult with a surgeon before deciding.

13. On December 20, 2010, Dr. Lieb performed an EMR on Mr. Delgado.

14. Dr. Lieb credibly testified he did expect Mr. Delgado's rectal mass to be cancer but during the procedure discovered a differently shaped mass than he expected. Dr. Lieb then realized Mr. Delgado's rectal mass was likely cancerous.

15. Dr. Lieb removed 80% of Mr. Delgado's rectal mass including all of the likely cancerous parts. He did not remove the entire mass because he feared he might perforate Mr. Delgado's rectum or cause a bleed in the process.

16. On December 21, 2010, Mr. Delgado underwent a full body PET-CT scan at the VA.

17. The VA biopsied Mr. Delgado's rectal mass and diagnosed it as an adenocarcinoma, a malignant rectal tumor.

18. The VA's tumor board determined Mr. Delgado should undergo neoadjuvant chemotherapy and radiation therapy ("chemoradiation") before he would undergo surgical resection of the tumor.

19. Dr. Keerthi Gogineni, a VA oncologist, treated Mr. Delgado during his neoadjuvant chemotherapy and radiation therapy.

20. Mr. Delgado began chemoradiation with Dr. Gogineni on February 10, 2011.

21. Dr. Gogineni testified Mr. Delgado attended all chemotherapy appointments with her through February, March, and April but she is aware he missed appointments and had to make up some radiation appointments.

22. On April 7, 2011, Mr. Delgado completed his last radiation appointment and his prescribed neo-adjuvant chemoradiation.

23. On May 11, 2011, Mr. Delgado had a PET-CT scan to determine if he was ready for post-chemoradiation surgery.

24. On May 24, 2011, Mr. Delgado went to the VA's surgical oncology department for a surgical consult.

25. Dr. Schnelldorfer, a surgical oncologist, and Sandra L. Hayes, a nurse practioner, evaluated Mr. Delgado and informed him the PET-CT scan showed a possible lesion on Mr. Delgado's liver. Dr. Schnelldorfer and Ms. Hayes told him them would do more tests.

26. The VA did not have a colorectal surgeon on staff at the time. Ms. Hayes completed and submitted for approval the necessary paperwork for Mr. Delgado to see a non-VA colorectal surgeon.

27. In early June, Mr. Delgado underwent a CAT scan and ultrasound of his possible liver lesion. Ms. Hayes credibly testified they were unable to see any liver lesion on the CAT scan or ultrasound.

28. Ms. Hayes credibly testified the VA adopted a wait and see approach with Mr. Delgado's possible liver lesion.

29. On June 9, 2011, Dr. Lieb performed an endoscopic ultrasound (EUS) and a flexible sigmoidoscopy procedure to evaluate Mr. Delgado's colorectal cancer treatment. Dr. Lieb did not see any evidence of cancer remaining in the rectum.

30. On June 16, 2011, Mr. Delgado saw Dr. Gogineni. Dr. Gogineni noted 9 weeks had passed since Mr. Delgado completed neo-adjuvant chemoradiation and he needed to see a colorectal surgeon.

31. On July 7, 2011, Mr. Delgado reported to the VA Emergency Department and the VA admitted him for treatment.

32. On July 11, 2011, medical student Sunny J. Haft noted in Mr. Delgado's records that the surgical oncology unit was still waiting for approval to schedule Mr. Delgado's non-VA surgical consult at HUP.

33. Later that day, Rodina Bryant, a VA scheduler, received approval for Mr. Delgado to see a HUP colorectal surgeon.

34. Ms. Bryant scheduled Mr. Delgado for an appointment with a HUP colorectal surgeon, Dr. Mahmoud, on July 14, 2011 at 10 A.M.

35. Mr. Delgado did not appear on July 14, 2011 at 10 A.M.

36. The parties dispute whether Mr. Delgado purposely cancelled the appointment.

37. We find Mr. Delgado called HUP the morning of July 14, 2011 and canceled his appointment with Dr. Mahmoud.

38. Later on July 14, 2011, Ms. Bryant credibly testified Mr. Delgado came to see her at the VA and she rescheduled his appointment with Dr. Mahmoud for August 15, 2011. Ms. Bryant also credibly testified she explained to Mr. Delgado he needed to stop by at the Department of Records and sign a release to have his records sent to Dr. Mahmoud.

39. On July 21, 2011, Mr. Delgado again saw Dr. Gogineni.

40. On August 15, 2011, Mr. Delgado went to his appointment with Dr. Mahmoud at HUP. Dr. Mahmoud did not then have Mr. Delgado's medical records from the VA and she could not examine Mr. Delgado or schedule him for surgery.

41. Unrelated to Mr. Delgado's case but to his benefit, the VA hired a colorectal surgeon, Dr. Emily Paulson, MD, to serve VA patients. She began work on August 15, 2011.

42. On August 25, 2011, Dr. Gogineni reported another visit with Mr. Delgado and stated Mr. Delgado had attended an appointment at the HUP, but the VA failed to provide HUP with the Mr. Delgado's medical records.

43. On August 30, 2011, Ms. Hayes saw Mr. Delgado for a follow up visit to prepare Mr. Delgado for colorectal surgery.

44. Dr. Paulson scheduled Mr. Delgado for colorectal surgery on September 9, 2011 at the VA.

45. The VA admitted Mr. Delgado on September 7, 2011 to prepare him for surgery.

46. The VA scheduled Mr. Delgado for a PET-CT scan on September 8, 2011 and the EUS procedure and transanal excision of the residual rectal tumor on September 9, 2011.

47. On September 8, 2011, Dr. Paulson noted, due to a miscommunication with the PET team, Mr. Delgado did not have a PET-CT scan.

48. On September 9, 2011, Dr. Paulson planned to perform an Exam Under Anesthesia (EUA) and then a transanal excision of residual polypoid tissue visualized by Dr. Lieb's flexible sigmoidoscopy on June 9, 2011.

49. Dr. Paulson performed the EUA but could not visualize a rectal tumor.

50. Dr. Paulson credibly testified there was no evidence of obvious cancer tissue in Mr. Delgado's rectum.

51. On September 12, 2011, Mr. Delgado, still hospitalized, underwent a PET-CT scan which showed an increase in size of the liver lesion first seen during the May 24, 2011 PET-CT scan.

52. The next day, Dr. Lieb performed a flexible sigmoidoscopy procedure and removed tissue from the Mr. Delgado's rectum.

6

53. Dr. Lieb had the rectal tissue biopsied showing no more cancer in Mr. Delgado's rectum.

54. On September 22, 2011, Dr. Paulson met with Mr. Delgado and discussed the liver lesion. Dr. Paulson told Mr. Delgado he had cancer in his liver and she strongly recommended they perform a liver resection (removing the cancerous part) as soon as possible to stop any further cancer spread. Dr. Paulson also explained they could do chemoradiation therapy to shrink the liver lesion but it would likely not cure the cancer.

55. Dr. Paulson credibly testified Mr. Delgado refused to have the liver surgery for at least three months because he was not mentally or physically ready for surgery yet.

56. Dr. Lieb learned Mr. Delgado refused immediate surgery and he credibly testified he was deeply concerned.

57. On October 4, 2011, Dr. Lieb sent a certified letter to Mr. Delgado explaining why he believed Mr. Delgado should have liver resection surgery immediately. Dr. Lieb wrote "[i]n a sense you have a rare opportunity that not many patients with your condition have, namely a likely spread of cancer that appears to be completely (potentially) curable with surgery."[1]

58. Dr. Lieb also credibly testified the benefits of liver resection surgery outweighed the risks because Mr. Delgado could be cured of cancer and without lasting damage because his liver would regenerate over time so there it would not negatively impact his major life functions.

59. We find Dr. Lieb's testimony to be credible in all aspects of his care.

60. On October 17, 2011, Mr. Delgado dropped by Dr. Lieb's office. Mr. Delgado explained to Dr. Lieb he received his letter and he was willing to have surgery, just not until after

7

the 2011 Christmas season. Dr. Lieb encouraged him not to wait so long but Mr. Delgado preferred waiting.

61.   Mr. Delgado received chemotherapy for his liver cancer at the VA during October and November 2011.

62.   In March 2012, Dr. Paulson performed a successful liver resection surgery on Mr. Delgado.

63.   Mr. Delgado has remained cancer free since his March 2012 surgery.

64.   Mr. Delgado did not suffer any unusual complications from his treatments. Typical of major abdominal surgeries, Mr. Delgado developed a small hernia which was successfully repaired. He also experiences some pain and swelling at the incision site.

65.   Mr. Delgado did not pay for any of the treatments described and does not owe any money to the VA. The VA paid for all of Mr. Delgado's medical treatments.

66.   On May 20, 2014, Mr. Delgado attended a meeting with Ralph M. Schapira, M.D., Chief of Staff, for the "Disclosure of an Adverse Event." The VA provided Mr. Delgado with a statement of disclosure. The VA's record of the meeting provides: "Summary of information presented regarding adverse event: A delay in diagnosis of colon cancer which might have resulted in progression to a later stage."

67.   Mr. Delgado alleges the negligent treatment he received at the VA caused him to suffer serious injuries including the progression of his disease, additional treatment and surgical procedures, and decreased chance of survival from his disease.

68.   On or about July 15, 2014, Mr. Delgado submitted a Standard Form 95 with the VA's Office of Regional Counsel, asserting an administrative claim for damages and injuries under the Federal Tort Claims Act.

69. On or about July 22, 2014, the Office of Regional Counsel acknowledged receipt of the service of the claim.

70. On or about October 23, 2015, the Office of Regional Counsel denied Mr. Delgado's claim because their investigation concluded "the standard of care was followed by Mr. Delgado's clinicians at the [VA] in providing for his care and treatment."

71. On April 14, 2016, Mr. Delgado sued the United States of America alleging the VA committed medical malpractice in treating his colorectal cancer.

72. On January 17, 2017, we began a four day bench trial. Mr. Delgado presented testimony from himself, his expert Dr. Barry Singer, Dr. Keerthi Gogineni, Daniel Halstead, Dr. Ralph Schapira, Susan Kirlin, Sandra Hayes, CRNP, and Amanda Buckley.

73. Upon Mr. Delgado closing his case, the United States moved for judgment as a matter of law arguing (1) the statute of limitations barred Mr. Delgado's claim; (2) Mr. Delgado did not prove he suffered any damages; and, (3) Mr. Delgado did not provide evidence of a surgical standard of care or a breach of the standard.

74. We denied the United States' motion as to its argument the statute of limitations barred Mr. Delgado's claims. We granted in part United States' judgment as a matter of law because Mr. Delgado "adduced no expert evidence of a surgical standard of care and cannot challenge a surgeon's conduct in scheduling or deferring surgery."[2]

75. We found Mr. Delgado adduced sufficient evidence of one claim: whether the VA deviated "from an oncologist's and hospital's standard of care in advising [Mr. Delgado] of options regarding a surgical consult in December 2010 and in scheduling of a surgical consult after the end of chemoradiation therapy in April 2011 which may have led to a spread of cancer

to the liver; and whether [Mr. Delgado] has established damages from an impairment to general health, permanent damage to an organ or chronic pain."[3]

76. The United States then presented testimony from Chinyere Achi, Dr. John Lieb, Dr. Emily Paulson, Rodina Bryant, and its expert Dr. Jeffery Butcher.

### *Expert Testimony*

77. We evaluated expert testimony from Dr. Barry Singer and Dr. Jeffery Butcher.

78. Dr. Barry Singer is a board certified medical oncologist admitted as an expert to testify to standard of care (1) for a patient to be referred to a surgeon after completion of chemoradiation and, (2) the effect of delays in referral to the surgeon could cause metastasize of the cancer to the liver.

79. Dr. Singer opined the oncologist standard of care for the December 2010 surgical consult is informing the patient of his options, including surgery and "[t]he breach was not informing the patient that he could have surgery. The patient would be the one to decide, but he would have to know that if the EMR was not successful, the surgeon would not be able to do the procedure immediately because of [the EMR]. But certainly, the patient has to have that choice."[4]

80. Dr. Singer opined the standard of care requires a 6 to 8 weeks healing period after completing chemoradiation, after which a patient is generally ready to be seen by a colorectal surgeon.[5]

81. Dr. Singer opined it is a breach of the standard of care to refer a patient to a colorectal surgeon more than 6 to 8 weeks after the completion of chemoradiation.[6]

82. Dr. Singer opined scheduling a July 2011 surgical consult for Mr. Delgado would not breach the standard of care resulting in liver cancer.[7]

10

83. Dr. Singer opined it is a breach of the standard of care not to remove Mr. Delgado's colorectal mass in December 2010 "before it had the chance to metastasize to the liver."[8] We do not credit this testimony after evaluating all of the expert opinions; we cannot find the standard of care requires major rectal surgery before a diagnosis of cancer.

84. Dr. Jeffery Butcher is a board certified colorectal surgeon and we admitted him as an expert to testify to the standard of care in the diagnosis and treatment in colorectal cancer and metastasis.

85. Dr. Butcher opined for a patient with a colorectal mass, possibly cancerous, deciding between EMR and rectal surgery, the standard of care does not require both the surgeon and endoscopist to discuss treatment plans with the patient.[9]

86. Dr. Butcher opined he would not have done surgery on Mr. Delgado's rectum in December 2010 because he "would be potentially removing [Mr. Delgado's] rectum…if there was not cancer there and this was something that could be removed via [EMR], there are many, many less complications in that procedure for the patient."[10]

87. Dr. Butcher further opined "for the last 15-plus years, the standard of care has been to adequately stage a [high risk colorectal patient] to radiate before surgery as opposed to after surgery" because: (1) radiation in rectum is more effective before surgery than after; and, (2) the surgical side effects to a patient's bowels are more pronounced if radiation occurs after surgery.[11]

88. Dr. Butcher opined the VA did not breach the standard of care in scheduling Mr. Delgado's surgery in July 2011 about 13 weeks after Mr. Delgado completed chemoradiation because surgeons wait "generally speaking 6 to 12 weeks…personally, I got somewhere around 10 weeks, somewhere in that 10 to 12 [week] range."[12] We credit this testimony.

11

## II. Conclusions of Law.

89. Pennsylvania law governs whether the doctors deviated from the standard of care causing Mr. Delgado damages.

90. The United States, through the Philadelphia VA Medical Center, owed Mr. Delgado a duty to provide medical care.

91. The standard of care when advising a patient with a colorectal mass, possibly cancerous, regarding treatment options does not require both a surgeon and an gastroenterologist advise the patient of his options.

92. The disclosure of options provided to Mr. Delgado met the standard of care.

93. The Philadelphia VA Medical Center, through Dr. Lieb, did not deviate from the standard of care in advising Mr. Delgado of the options to treat his colorectal cancer in December 2010.

94. The standard of care in scheduling a surgical consult for a patient is within approximately six to twelve weeks after the end of the chemoradiation subject to an oncologist's and surgeon's evaluation of each patient's individual health.

95. The Philadelphia VA Medical Center did not deviate from the standard of care by scheduling Mr. Delgado's surgical consult on July 14, 2011 after he completed chemoradiation therapy in April 2011.

96. Even assuming we found a breach of standard of care, we find no evidence of damages suffered by Mr. Delgado. Mr. Delgado is cancer free at the time of trial. He adduced no evidence of harm outside of normal surgical discomfort. A grateful nation paid his medical bills in appreciation of his military service.

## *Analysis*

Mr. Delgado alleged the Philadelphia VA Medical Center negligently treated his colorectal cancer from December 2010 through September 2011.[13] Mr. Delgado brought his claim against the United States under the Federal Tort Claims Act ("Act"). We determine the United States' liability under the state law where the alleged tortious activity happened.[14] To prove medical negligence in Pennsylvania, Mr. Delgado must prove: (1) the VA and its physicians owed a duty to him; (2) the physician's treatment of Mr. Delgado breached the standard of care; (3) the physician's breach is the proximate cause of Mr. Delgado's harm; and, (4) Mr. Delgado suffered damages as a result of the physician's breach.[15]

There is no dispute the VA and its physicians owed Mr. Delgado a duty.

Mr. Delgado did not prove the VA breached its standard of care either: (1) by advising Mr. Delgado of his options regarding a surgical consult in December 2010; or, (2) by scheduling a surgical consult after the end of chemoradiation therapy in April 2011 which may have led to a spread of cancer to the liver. The standard of care required of the VA and its physicians is "to possess and employ in the treatment of [Mr. Delgado] the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of treatment."[16] A physician who is a specialist is held to higher standard and is "expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of diseases with the specialty."[17]

Pennsylvania law requires Mr. Delgado to provide medical expert testimony of the applicable standard of care the physician owed him and the physician breached the standard in his or her treatment of Mr. Delgado to prove his medical negligence claim.[18]

A.  **There is no breach in advising Mr. Delgado of his options regarding a surgical consult in December 2010.**

Mr. Delgado did not adduce expert testimony the VA breached the standard of care in advising him of his surgical and non-surgical options to treat his colorectal mass, possibly cancerous, in December 2010. Mr. Delgado's expert, Dr. Singer, testified in December 2010 the standard of care required the VA "inform[] the patient that he could have surgery. The patient would be the one to decide, but he would have to know that if the EMR was not successful, the surgeon would not be able to do the procedure immediately because of what happened there. But certainly, the patient has to have that choice."[19] Dr. Butcher also testified for a patient a colorectal mass, possibly cancerous, deciding between EMR and rectal surgery, the standard of care does not require both the surgeon and gastroenterologist to discuss treatment plans with the patient.[20]

The credible and uncontradicted testimony and evidence shows the VA, through Dr. Lieb, met the standard of care of a surgical consult described by Dr. Singer. Dr. Lieb evaluated Mr. Delgado during the colonoscopy and believed the colorectal mass to be a large adenoma rather than cancer. Dr. Lieb credibly testified and the VA medical records confirm, he had an "extensive discussion"[21] with Mr. Delgado explaining two courses of treatment: (1) he could have the mass removed by surgery, where a colorectal surgeon would remove part of the colon and/or rectum; or, (2) Dr. Lieb could remove a large portion of the mass through a non-surgery endoscopic mucosal resection ("EMR"). Dr. Lieb credibly testified he explained the risks and benefits of both options to Mr. Delgado and offered him a consult with a surgeon before deciding. Dr. Lieb testified "I do let them know, I'm not a surgeon. There may be some specifics that I may not know about surgery and I can tell you the general idea."[22] Dr. Lieb credibly testified Mr. Delgado "did not even want to see a surgeon."[23] Dr. Lieb testified he again

14

discussed Mr. Delgado's choice of EMR over surgery right before performing the EMR and Mr. Delgado affirmed his choice.

Dr. Lieb's conduct met the standard of care testified to by both experts. Mr. Delgado made an informed choice to proceed with EMR over colorectal surgery in December 2010. Mr. Delgado cannot prove medical negligence because he did not adduce evidence the VA breached the standard of care in advising him of his surgical and non-surgical options to treat his colorectal mass, possibly cancerous, in December 2010.[24]

### B. There is no breach in scheduling of a surgical consult after the end of chemoradiation therapy in April 2011 which may have led to a spread of cancer to the liver.

Mr. Delgado did not adduce evidence the VA breached the standard of care in scheduling a surgical consult after the end of chemoradiation therapy in April 2011 which may have led to a spread of cancer to the liver.

#### 1. No breach in scheduling Mr. Delgado's July 14, 2011 surgical consult.

In his expert opinion as a colorectal surgeon, Dr. Butcher the standard of care is scheduling a patient's colorectal surgery 6 to 12 weeks after completion of chemoradiation. Dr. Butcher testified he evaluates each patient individually but generally prefers to wait "somewhere around 10 weeks, somewhere in that 10 to 12 [week] range."[25]

Mr. Delgado completed his chemoradiation on April 7, 2011. Approximately 7 weeks later, on May 24, 2011, Dr. Schnelldorfer saw Mr. Delgado for surgical oncologist appointment. The VA scheduled Mr. Delgado to see an HUP colorectal surgeon on July 14, 2011, approximately 14 weeks after the completion of chemoradiation.

We understand 14 weeks is outside Dr. Butcher's standard of care of a 6 to 12 week range for scheduling. In Dr. Butcher's expert opinion scheduling Mr. Delgado's appointment for

15

July 14, 2011 is "appropriate" under the breach the standard of care because "nothing would have changed within a one-plus week."[26] Dr. Butcher also testified "there is a role in watchful waiting for someone to complete [his] response" to chemoradiation.[27] Mr. Delgado's expert, Dr. Singer testified a July 2011 appointment with a colorectal surgeon would not have been a breach of the standard of care.[28]

We find the VA, through Dr. Lieb, Dr. Gogineni, Dr. Schellendorfer, "watchfully waited" and evaluated Mr. Delgado's individual health throughout those 14 weeks. We are particularly persuaded by Dr. Lieb's testimony on June 9, 2011, he conducted an EUS and flexible sigmoidoscopy procedure on Mr. Delgado's rectum and did not see evidence of remaining cancer. We do not find the scheduling of Mr. Delgado's surgical consult approximately two weeks outside the 6-12 week range to breach the standard of care.

### 2. Further delays in scheduling attributable to Mr. Delgado.

Mr. Delgado canceled his July 14, 2011 appointment with the HUP colorectal surgeon and the VA rescheduled it for August 15, 2011. Mr. Delgado did not release his VA medical records before his August 15, 2011 appointment so the HUP colorectal surgeon could not evaluate him. Mr. Delgado saw a VA colorectal surgeon, Dr. Paulson, on September 9, 2011. While we must consider evidence of Mr. Delgado's contributory negligence in delays in his treatment, it is undisputed the delays did not harm Mr. Delgado because he never needed colorectal surgery.[29]

Dr. Paulson evaluated Mr. Delgado, found no cancer remaining in his rectum, and declined to perform surgery. Mr. Delgado never had colorectal surgery because chemoradiation fortunately eradicated the cancer in his rectum. Dr. Gogineni, his oncologist, testified she was concerned about delays in Mr. Delgado seeing a surgeon after chemoradiation but concluded

16

"nothing happened as a result of that delay" in not seeing Dr. Paulson until September 9, 2011.[30] Even if the VA was negligent, injury to Mr. Delgado is necessary to prove medical malpractice because "there [is] no cause of action to anybody until an injury was received."[31]

### 3. No increased risk of liver cancer because there is no breach.

The delay in scheduling Mr. Delgado's July 14, 2011 surgical consultation did not cause an increased risk of harm to his liver cancer. The additional delays between July 14, 2011 and his September 9, 2011 appointment are attributable to Mr. Delgado's conduct, not any breach by the VA.

Even if there is a breach, the delay from 8 to 12 weeks after the completion of chemoradiation until July, August or even September 2011 did not cause an increased risk of cancer in Mr. Delgado's liver. Dr. Schnelldorfer and Ms. Hayes saw a possible liver lesion on a PET/CT scan on May 24, 2011. In early June 2011, they did a follow up CAT scan and ultrasound and those tests did not show a liver lesion. The VA adopted a wait and watch approach to Mr. Delgado's possible liver lesion while treating his confirmed colorectal cancer. In late August 2011, Mr. Delgado's liver lesion became fully visible on PET/CT scans and by early September 2011, Dr. Paulson recommended liver surgery to Mr. Delgado and he refused.

Mr. Delgado suggests he would have never developed liver cancer if a surgeon had removed his rectal mass in December 2010. Dr. Singer testified this is a breach of the standard of care in his expert opinion. We do not credit this testimony in light of expert testimony.

Dr. Lieb credibly testified he gave Mr. Delgado both options, surgery and EMR, in an "extensive discussion" and Mr. Delgado made his choice. After EMR, the VA oncology department made a definitive diagnosis of colorectal cancer and decided chemoradiation

17

followed by colorectal surgery. While Mr. Delgado did eventually develop cancer in his liver, we cannot speculate when the cancer cells metastasized from the rectal mass to his liver.

Mr. Delgado's argument would set a dangerous precedent. A doctor would be incentivized to encourage surgery for every rectal mass without a definitive cancer diagnosis because they will be held liable for any cancer spread to other organs. In light of the undisputed testimony of the risks and inconveniences of removing part of a patient's rectum, including the real possibility of a permanent colostomy bag, we do not think this is a wise or prudent precedent.

There is no breach in the standard of care in treating Mr. Delgado's colorectal cancer which caused or failed to stop, its metastasizing to his liver.

### III. Conclusion

Trial allows the fact finder to carefully evaluate witness credibility including from treating physicians and medical experts. Mr. Delgado's negligence theories made sense based on allegations and pre-trial submissions. We needed to hear evidence regarding the medical reasons for the staged protocol in treating Mr. Delgado's colorectal and then liver cancer. We needed to evaluate Mr. Delgado's role in meeting the surgeon's demands on timing issues. After evaluating witness credibility, we cannot find the VA doctors treating Mr. Delgado for colorectal cancer followed by a liver lesion breached a standard of care. The doctors advised Mr. Delgado of his options. Mr. Delgado, either by decision or omission, did not move as quickly as he now claims the doctors should have moved. We disagree as to his narrow view of doctor response times. The VA doctors adhered to the standard of care. At the time of trial, Mr. Delgado is cancer free. He is not saddled with a lifetime colostomy bag. Because of his Army service, he did not pay for these medical services. We find no breach of the standard of care and

accordingly enter judgment following our non-jury trial in favor of the VA in the accompanying Order.

---

[1] VAMC_005578.

[2] ECF Doc. No. 38.

[3] *Id.*

[4] N.T. January 18, 2017 p. 38:2-8.

[5] *Id.* p. 46:18-47:6.

[6] *Id.* p. 49:17-21.

[7] *Id.* p. 69:1-6.

[8] *Id.* p. 44:12-15.

[9] N.T. January 19, 2017 p. 220:10-15.

[10] *Id.* pp. 160:19-161:2.

[11] *Id.* pp. 166:6-167:6.

[12] *Id.* p. 179:6-23.

[13] The United States argues the statute of limitations bars Mr. Delgado's claims arising from 2010 and 2011 medical treatment. We find Mr. Delgado does not prove negligence and decline to reach this alternative affirmative defense.

[14] *DeJesus v. U.S. Dep't of Veterans Affairs*, 479 F.3d 271, 279 (3d Cir. 2007) (citing 28 U.S.C. § 2674).

[15] *See Smith v. United States*, No. 09-249, 2012 WL 3017704 at *7 (W.D. Pa. July 23, 2012).

[16] *Id.* (internal citations omitted).

[17] *Id.*

[18] *See Miville v. Abington Memorial Hosp.*, 377 F. Supp. 2d 488, 490-91 (E.D. Pa. 2005)(*citing* 40 Penn. Stat. Ann. § 1303.512).

[19] N.T. January 18, 2017 p. 38:2-8.

---

[20] N.T. January 19, 2017 p. 220:10-15.

[21] *Id.* p. 74:13.

[22] *Id.* p. 78:3-6.

[23] *Id.* p. 82:1.

[24] *See Miville*, 377 F. Supp. 2d at 490-91 (*citing* 40 Penn. Stat. Ann. § 1303.512).

[25] N.T. January 19, 2017 p. 179:6-23.

[26] *Id.* at 179:9-17.

[27] *Id.* p. 180:7-9.

[28] N.T. January 18, 2017 p. 69:1-6.

[29] *See Alexander v. Univ. of Pittsburgh Med. Ctr. Sys.*, 185 F.3d 141, 146 (3d Cir. 1999) ("Under Pennsylvania law, which is applicable here, if there is any evidence of contributory negligence in a medical malpractice case, the court must submit the issue to the jury, even if the evidence to the contrary is strong").

[30] N.T. January 17, 2017 p. 104:21-25.

[31] *Sease v. Dobish*, No. 1968 MDA 2011, 2013 WL 11282811, at *7 (Pa. Super. Feb. 21, 2013) (quoting *Hoodmacher v. Lehigh Valley R. Co.*, 218 Pa. 21, 23, 66 A. 975, 976 (1907)).